

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00640-CR

JAMES TYLER POOL                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In two points, Appellant James Tyler Pool appeals the revocation of his community supervision. We reverse and remand.

---

[1]*See* Tex. R. App. P. 47.4.

## II.  Procedural Background

Pool pleaded guilty to failure to register as a sex offender in exchange for twenty-four months' confinement, probated, and was placed on community supervision until October 13, 2012.  On August 2, 2012, the State filed a motion to revoke Pool's community supervision on two grounds.  The first ground, and the only one at issue in this case, alleged that Pool had violated his community supervision by, on or about July 9, 2012, using a vehicle to intentionally flee from a police officer, knowing that the officer was attempting to lawfully arrest or detain him.  The State also alleged that on or about that same date, Pool had operated a motor vehicle on a public road or highway while his driver's license was suspended.  Pool pleaded not true to both grounds.  After a hearing, the trial court revoked Pool's community supervision on the first ground in the State's motion and did not rule on the second ground.  The trial court reformed the original judgment to reflect a sentence of eighteen months' confinement, and this appeal followed.

## III.  Sufficiency of the Evidence

In his second point, Pool argues that the evidence is insufficient to support revocation because it did not show that he intentionally fled from the officer.

## A.  Standard of Review and Applicable Law

We review the trial court's decision to revoke community supervision for an abuse of discretion.  *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006) (citing *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984)).

2

The trial court does not abuse its discretion if the order revoking community supervision is supported by a preponderance of the evidence, that is, if the greater weight of the credible evidence would create a reasonable belief that the defendant has violated a condition of his community supervision. *Id.* at 763–64; *Edwards v. State*, 54 S.W.3d 834, 835 (Tex. App.—Fort Worth 2001, pet. ref'd). In conducting our review, we view the evidence in the light most favorable to the trial court's ruling. *Cardona*, 665 S.W.2d at 493. When the State fails to meet its burden of proof, the trial court abuses its discretion by issuing an order to revoke community supervision. *Id.* at 493–94.

A person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him. *See* Tex. Penal Code Ann. § 38.04(a) (West 2011 & Supp. 2012). For a defendant to be found guilty of evading arrest or detention, "it is essential that a defendant know the peace officer is attempting to arrest him." *Jackson v. State*, 718 S.W.2d 724, 726 (Tex. Crim. App. 1986); *see also Duvall v. State*, 367 S.W.3d 509, 511 (Tex. App.—Texarkana 2012, pet. ref'd). We may infer an actor's mental state from his actions and statements during and after the incident. *Griego v. State*, 345 S.W.3d 742, 753 (Tex. App.—Amarillo 2011, no pet.). Further, speed, distance, and duration of pursuit may be factors in considering whether a defendant intentionally fled, but no particular speed, distance, or duration is required to show that requisite intent if other evidence establishes such intent. *Id.* at 751.

3

**B. Evidence**

Springtown Police Officer Brad Sauls testified that around 5:23 p.m. on July 9, 2012, he was dispatched about a possible reckless driver. When he saw Pool, a person meeting the description he had received, he turned around to follow him but did not activate his lights or sirens at first. When Pool's motorcycle exceeded the speed limit—going thirty-nine miles per hour in a thirty-mile-per-hour zone—Officer Sauls attempted to pull him over. He used his in-car public announcement system to tell Pool to "[p]ull it over" and activated his marked patrol unit's siren and lights. Officer Sauls stated that a number of other vehicles pulled over in response to his lights and siren and that in "the majority of [his] stops" using a loudspeaker, the person being stopped can hear the loudspeaker. Officer Sauls stated that when Pool reached the seventy-mile-an-hour zone, he drove eighty miles per hour, but when he reached the construction zone, he slowed down and did not pass anyone.

The trial court admitted State's Exhibit 1, the dashboard camera DVD from Officer Sauls's patrol car. The time stamp on the ten-minute pursuit starts at four minutes, thirty seconds, and the audio does not begin until around a minute later. The sound of Pool's motorcycle is audible on the DVD. At five minutes, fifty-three seconds, Officer Sauls orders Pool to pull over. Pool passes a car that is pulling over, and a few seconds later, Officer Sauls reflects that Pool's speed is fifty miles per hour. Pool passes another vehicle that is pulling over and passes a truck making a right turn before Officer Sauls notes that Pool has started

4

driving sixty miles per hour. Pool passes two more vehicles that have pulled to the side before Officer Sauls notes that Pool has started driving eighty miles per hour. Around three minutes later, as Pool slows at an intersection, signals a turn, and comes to a stop, Officer Sauls drives his vehicle in front of him to get Pool's attention. Pool asks, "What's going on, what's wrong?" Pool makes additional statements that indicate that he did not know that Officer Sauls had been pursuing him since Springtown, such as, "Springtown? Really?" Officer Sauls testified that Pool turned off his motorcycle, did not attempt to leave the scene, offered no resistance, and was compliant with Officer Sauls's requests.

The DVD shows that some cars on both sides of the road pulled over as the patrol car approached. However, it also shows that many other vehicles on both sides of the road did not pull over or take any other action. Further, although Officer Sauls testified that he could see his patrol car's lights and Pool's face mask[2] in the mirrors and chrome of Pool's motorcycle, this is not discernable on the DVD. Officer Sauls agreed during cross-examination that Pool did not turn around during the pursuit.

During cross-examination, Officer Sauls stated that a typical individual in flight might weave in and out of traffic, go over the speed limit, take corners too fast, crash into other cars, or get out of and run from the vehicle once it comes to

_____

[2]The Prosecutor's question was, "And through the mirrors on the bike, can you see the face or face mask of the defendant?" Officer Sauls replied, "Yes, sir," making it unclear without the DVD that he saw either Pool's face or Pool's face mask. The DVD shows that Pool was wearing a full helmet.

a stop. He said that Pool weaved in and out to avoid cars that were pulling over or that were in his path. However, in the DVD, Pool does not appear to rapidly speed up or slow down or take any other action indicating that he was aware of the officer's presence; he takes no turns, although as Officer Sauls acknowledged, there were several roads that intersected the one they were on. Officer Sauls acknowledged that Pool did not try to evade him by taking any of the intersecting roads. Further, although Officer Sauls contended that Pool had weaved in and out of traffic, during cross-examination on specific instances on the DVD of Pool passing other vehicles, the following dialogue ensued,

> Q. . . . Officer Sauls, at this point in time, did the motorcycle go in between the truck to pass him, in between the truck and the other lane?

> A. No, sir. It's [sic] appears to be a blind corner.

> (DVD played to the court)

> Q. . . . At this point in time, did he go in between the truck and the other lane?

> A. I do believe that's a no-passing zone, no.

> Q. Okay. So you're saying Mr. Pool followed all traffic rules in this—in this—at this stop?

> A. No, sir. He was also exceeding the speed limit in that area.

> (DVD played to the court)

> Q. . . . How—how about this? Could—could he go—could he go past it? (Indicating)

A. He physically could go past it, but, at the same time, it's not safe.

Q. My question is, could he go past the truck at this point in time?

A. He could.

With regard to speeding, Officer Sauls testified that Pool drove eighty miles per hour in a seventy-mile-per-hour zone, but the State did not bring this as a ground in its motion to revoke. Officer Sauls also testified that Pool had committed failure to yield right-of-way to an emergency vehicle, but the State also did not bring this as a ground in its motion to revoke.

Bobby Hayworth, Pool's community supervision officer, testified that Pool told him that he did not realize the officer was behind him and did not try to evade him. Pool told him that he had been "zoned-in" on driving and was not paying attention to what was around him. Hayworth also confirmed that Pool had a hearing problem, stating that he would have to be sure that Pool heard what he said but that they were always able to communicate. During cross-examination, Hayworth acknowledged that when he spoke with Pool, it was either in his office or "in the field" but always face-to-face and without other people coming in and talking to them at the same time. He also agreed that Pool is a person who wants to do the right thing, that Pool is a smart guy, that Pool was current on his community service, and that Pool did as well as he could on community supervision, even when he had financial problems.

7

During the defense's case, Pool's mother Lisa Brown, who is an administrative sergeant in a county sheriff's department in Kansas, testified that a childhood accident had resulted in Pool losing 75% of the hearing in his right ear and that this type of hearing loss could not be helped with a hearing aid. The trial court admitted Pool's medical records from the accident, which involved a skull fracture and massive blood loss from his right ear. Brown said that if Pool was asleep on his left side, he would not hear her even if she yelled at him; if she stood behind him, he would not hear her if he was in a large room; and if there were a lot of people in the room, he would have problems understanding someone trying to speak to him.[3] She also testified that Pool's motorcycle had loud factory exhaust pipes and that when riding with a full helmet, as Pool had done when Officer Sauls stopped him, ambient outside noise would be deadened. Brown stated that to her, the DVD showed Pool maintaining his lane, stopping at a stop sign, and using his turn signal, but not evading arrest.

Kenneth Kepner, a retired California police officer who had been in command of all traffic-related investigations in Fullerton, California, testified that

---

[3]Pool's father gave similar testimony about Pool's hearing loss, stating that to make sure Pool would hear something, he had to wave and make eye contact with him and that Pool's hearing could not be corrected with a hearing aid. Jennifer Harris, a licensed hearing aid dispenser, described Pool's hearing loss as profound in his right ear and moderate in his left ear based on her examination of Pool while he was incarcerated. The trial court admitted the October 2012 hearing test that she administered to Pool.

8

from his review of the DVD, Pool did not appear to have attempted to evade the

officer. Officer Kepner based his conclusion as follows:

> He had several opportunities to put distance between him and the officer that was attempting to get him to yield. He did not take those opportunities. He didn't show any of the typical reactions of looking to his right or his left, and seemed to be concentrating consistently on what was ahead of him as opposed to what was behind him or how many people might be behind him in order to make a determination of what his next move was going to be in an evasion.

Gary Pool, Pool's father, testified that Pool was respectful of law enforcement. He also stated that the mirrors on Pool's motorcycle might be within Pool's peripheral vision but that they are very small and that when the face shield of the motorcycle helmet is down, peripheral vision is somewhat obstructed.

## C. Analysis

In the evading arrest cases that we have examined, there is consistently some affirmative act to show that the accused is trying to evade an officer.[4] In *Hobyl v. State*, the defendant testified that due to his motorcycle's noise, the wind, the hood he wore underneath his helmet, his flapping rain suit, and his crouched-down position on the motorcycle, he neither saw nor heard the pursuing officer. 152 S.W.3d 624, 626 (Tex. App.—Houston [1st Dist.] 2004),

---

[4]We also note that these cases involved convictions for evading arrest or detention under the beyond-a-reasonable-doubt standard, not the preponderance standard. Nonetheless, we find them instructive in determining sufficiency of the evidence to support the intentional flight element at issue here.

9

*pet. dism'd*, 193 S.W.3d 903 (Tex. Crim. App. 2006). However, in finding the evidence sufficient to support the jury's finding that he had intentionally fled from the officer, our sister court noted that the defendant had increased his speed to 110 miles per hour about the same time that the officer activated his marked patrol car's lights and siren in the three-mile-long, high-speed chase, and the officer testified that the defendant had looked from side to side in the motorcycle rearview mirrors, facts absent in the case before us. *See id.* at 627; *see also Guerrero v. State*, Nos. 02-11-00371-CR, 02-11-00372-CR, 2012 WL 3500564, at *4–5 (Tex. App.—Fort Worth Aug. 16, 2012, no pet.) (mem. op., not designated for publication) (affirming evading arrest conviction when appellant testified that she did not stop because she did not believe that she had to comply with the officer's order and the dashboard camera DVD showed her walk away from the officer after he initiated a traffic stop and repeatedly ordered her to get back in her vehicle); *Sanders v. State*, No. 02-11-00091-CR, 2012 WL 2579542, at *3 (Tex. App.—Fort Worth July 5, 2012, no pet.) (mem. op., not designated for publication) (noting that in addition to evidence showing that appellant ran a series of stop signs while pursued by a police car with flashing lights and sirens, appellant admitted that he saw the officer and intentionally fled from him); *Washington v. State*, 326 S.W.3d 302, 305, 310 (Tex. App.—Fort Worth 2010, pet. ref'd) (concluding evidence was sufficient to support intentional flight when officer testified that as arrest team converged on appellant's vehicle, appellant drove away at high speed and later told officer that he did not know why he had

10

run); *Horne v. State*, 228 S.W.3d 442, 444–45 (Tex. App.—Texarkana 2007, no pet.) (noting that after officer told appellant to pull over, appellant shook his head, kept driving, and drove onto a curb to circumvent the officer's car when the officer pulled his vehicle in front of appellant's vehicle); *Ester v. State*, 151 S.W.3d 660, 662 (Tex. App.—Waco 2004, no pet.) (stating that appellant fled at high speed, forced other drivers off road, and led officers on twenty-two mile chase after officer activated patrol car's overhead lights and siren); *Miller v. State*, No. 05-03-00488-CR, 2004 WL 1434549, at *1 (Tex. App.—Dallas June 28, 2004, no pet.) (mem. op., not designated for publication) (observing that after he saw unmarked police car's flashing lights, appellant accelerated, ran a red light, nearly collided with passing cars, and continued to flee on foot after crashing his vehicle); *Bunton v. State*, 136 S.W.3d 355, 360, 371 (Tex. App.—Austin 2004, pet. ref'd) (noting that as officers approached appellant's vehicle, he drove off and ran a red light, the officers pursued him at 100 miles per hour, and at least four oncoming vehicles had to swerve or pull to the right to avoid appellant's vehicle); *Chambers v. State*, No. 11-03-00035-CR, 2004 WL 404125, at *1–2 (Tex. App.—Eastland Mar. 4, 2004, pet. ref'd) (not designated for publication) (observing that after reserve deputy asked him for identification, defendant drove away, ignored commands to stop, and led law enforcement personnel on a high speed chase for around an hour); *Pina v. State*, 127 S.W.3d 68, 71, 75 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (stating that instead of following uniformed officer's command to stop, defendant moved faster and fled

toward house); *Rogers v. State*, 832 S.W.2d 442, 443–44 (Tex. App.—Austin 1992, no pet.) (noting that motorcycle driver sped up after he saw the officer activate his vehicle's overhead lights and motion for him to stop).

In contrast to these cases, in *Griego*, the court concluded that there was insufficient evidence to support intentional flight before the defendant exited his vehicle. 345 S.W.3d at 753–54. The officers drove behind the defendant's vehicle for approximately one block and directly behind him for only a matter of seconds before he pulled into a residential driveway, exited the vehicle, and started walking toward the residence. *Id.* Although he refused to stop walking toward the residence when the officers ordered him to stop, the court concluded that this was insufficient to establish that he had known that the officers were attempting to arrest or detain him prior to exiting his vehicle. *Id.* at 754. The court also considered the absence of affirmative evidence that the defendant should or could have seen the officers turn around to pursue him, the unremarkable speed at and manner in which he appeared to drive, and his conduct and statements upon exiting the car at the residence, which included his statement captured on the dashboard camera DVD that he did not "even know" that they had been following him. *Id.* at 753–54.

Here, the greater weight of the credible evidence, viewed in the light most favorable to the trial court's finding, could not create a reasonable belief that Pool had intentionally fled from Officer Sauls and thereby violated a condition of his community supervision. *See Rickels*, 202 S.W.3d at 763–64; *Cardona*, 665

12

S.W.2d at 493. Even if the trial court chose not to believe any of Pool's witnesses, Hayworth, Pool's community supervision officer, testified that Pool had a hearing problem. Officer Sauls testified that in "the majority of [his] stops" using the loudspeaker, the person being stopped can hear the loudspeaker, which indicates that there have been other stops by Officer Sauls in which the person being stopped could not hear the loudspeaker. Officer Sauls also agreed that to get Pool's attention, he drove in front of him when Pool slowed down to turn left. And while Officer Sauls testified that other vehicles' drivers pulled over in response to his lights and siren, the DVD showed that many other drivers appeared to ignore them.

Even though Officer Sauls testified that he could see his vehicle's lights reflected in Pool's motorcycle mirrors and the chrome on the motorcycle and could see Pool's face mask reflected in the mirrors, he agreed during cross-examination that Pool did not turn around during the pursuit, and the DVD establishes that Pool was wearing a full helmet and did not appear to look in any direction except the road in front of him.

Further, although Officer Sauls contended that Pool had weaved in and out of traffic, during cross-examination on specific instances of Pool passing other vehicles shown on the DVD, Officer Sauls agreed that Pool did not weave but pointed out that Pool had still exceeded the speed limit by driving eighty miles per hour in a seventy-mile-per-hour zone, which is not a ground that the State alleged in its motion to revoke.

13

Officer Sauls agreed that Pool asked him over and over again, "What's going on, what's wrong?" And he agreed that when he told Pool that he had been pursuing him since Springtown, Pool asked him, "Springtown?" in a questioning way. Finally, when Pool's counsel asked, "Would it be fair to say that if Mr. Pool didn't see you all this way until 114, and if—if Mr. Pool didn't hear you all this way to 114, that you may re-think your decision to arrest?," Officer Sauls stated, "I would still have made the arrest." Officer Sauls added that he would have made the arrest "[b]ased on the circumstances of the pursuit," which had included other traffic violations, only one of which was the other basis for the State's motion, and upon which the trial court did not rule.

While we must defer to the trial court's review of the evidence, the only evidence that Pool could have known that Officer Sauls was behind him was the other vehicles pulling over and Officer Sauls's testimony that he could see his patrol car's lights in Pool's mirrors. However, Officer Sauls's testimony about his patrol lights in Pool's mirrors shows only that *Officer Sauls* was looking at the mirrors; there is no testimony that *Pool* looked at the mirrors. To the contrary, Hayworth testified that Pool told him that he did not realize that the officer was behind him and that he was "zoned-in" on driving and not paying attention to what was around him—which would have included the other vehicles pulling over. And Pool's father testified that the motorcycle's mirrors are very small and at the periphery of the driver's vision and could be obstructed when the motorcycle helmet's face shield is down. From the DVD, it appears that Pool

14

looked straight ahead and not to his left or his right or behind him. Therefore, we conclude that there is insufficient evidence under the preponderance standard to show Pool's awareness that Officer Sauls was behind him. *See Griego*, 345 S.W.3d at 753–54. Because the State failed to meet its burden, the trial court abused its discretion by revoking Pool's community supervision. *See Cardona*, 665 S.W.2d at 493–94. We sustain Pool's second point; in light of this disposition, we do not reach his first point concerning the trial court's evidentiary rulings. *See* Tex. R. App. P. 47.1.

## V. Conclusion

Having sustained Pool's second point, we reverse the trial court's judgment and remand this case to the trial court to dismiss the State's motion to revoke.

PER CURIAM

PANEL: MCCOY, WALKER, and MEIER, JJ.

MEIER, J., dissents without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 30, 2013

15